FILED

2019 Nov-22  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### (Southern Division)

| | |
|---|---|
| **APRIL PIPKINS, individually, and as the Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR,**<br>**Plaintiff,**<br><br>**V.**<br><br>**JOHN JOE,**<br>**CITY OF HOOVER, ALABAMA,**<br>**Defendants.** | **No.**<br><br>**CIVIL ACTION – LAW**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

AND NOW comes the Plaintiff, APRIL PIPKINS, individually, and as the Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR, by and through her undersigned counsel, and avers as follows:

## I.  JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. § 1983.

2.    Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343 & 1367.

3.    Venue is proper in this Court, as all Defendants are located within the Northern District of Alabama, and the cause of action arose in the Northern District of Alabama.

## II.  PARTIES

4.      Plaintiff, APRIL PIPKINS (hereinafter "PIPKINS"), is the biological mother of the decedent, EMANTIC "EJ" FITZGERALD BRADFORD, JR, and is the duly appointed Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR ("ESTATE" or "Bradford").

5.      Defendant, JOHN DOE, is an adult individual, who during all relevant times, was employed by the City of Hoover, Alabama, as a police officer. All of JOHN DOE'S actions or inactions were taken under color of state law. He is sued in his individual and official capacity.

6.      Defendant, CITY OF HOOVER, ALABAMA (hereinafter "CITY") was incorporated in 1967 and has a mayor/council form of government. The CITY is located in Jefferson and Shelby Counties in the State of Alabama. The CITY owns and operates the Hoover Police Department, which during all relevant times, employed JOHN DOE.

III.    **MATERIAL FACTS**

      a.  **Emantic "EJ" Fitzgerald Bradford, Jr.**

7.      Emantic "EJ" Fitzgerald Bradford, Jr., was born on June 18, 1997.

8.      Bradford is the biological child of APRIL PIPKINS and EMANTIC BRADFORD, SR., and the older brother of KHALIL.

2

9.     Bradford earned his high school diploma and then enlisted in the United States Army.

10.     Bradford completed basic training and planned to become a combat engineer.

11.     Bradford had no criminal history, worked full time, and provided his mother with financial assistance.

12.     Bradford cared for his father EMANTIC BRADFORD, SR., who is a former Birmingham Police Department employee of 25 years, and who was suffering from cancer at the time of Bradford's untimely death.

### b. Alabama Gun Laws

13.     The State of Alabama is an "open carry" state, meaning citizens are lawfully permitted to openly carry a gun in public where it is not hidden from public view.

14.     In the State of Alabama, citizens are lawfully permitted to "conceal carry," meaning to carry a gun on one's person concealed from the public's view, as long as the person has obtained an Alabama Pistol Permit.

15.     During all relevant times, Bradford possessed a valid Alabama Pistol Permit.

16.     During all relevant times, Bradford exercised his Second Amendment right and his Alabama State law right to carry a concealed handgun.

### c.  Erron Brown Shoots Brian Wilson

17.     On November 22, 2018, Erron Brown shot 18-year old Brian Wilson, in the Riverchase Galleria Mall, which is located at 2000 Galleria Circle, Birmingham, Alabama 35244.

18.     The shooting occurred on a second floor walkway of the Galleria, in the vicinity of the JC Penny and FootAction stores.

19.     After shooting Wilson, Brown ran from the crime scene toward the JC Penny store.

### d.  JOHN DOE Unlawfully Shoots Bradford

20.     On the same date and approximate time, Bradford was lawfully in the Galleria in the vicinity of the FootAction store.

21.     Upon hearing the gunshots, Bradford, like other Mall patrons, immediately ran for safety.  After seeing Wilson had been shot, Bradford stopped, turned around, drew his lawfully possessed firearm and did what brave first responders and Good Samaritans do – he moved *toward* the location of the shooting to try to protect people and to assist the victim Wilson.

22.     On the same date and approximate time, JOHN DOE and another police officer were in the Galleria, in the vicinity of the Spencer's store, which was approximately 75 feet from the location where Brown had been shot.

23.     At the time, JOHN DOE and the second police officer were dually employed by both the CITY as a police officer, and the Galleria, as mall security.

24.     When the shooting occurred, both police officers were behind but in close proximity to Bradford.

25.     Upon hearing the gunshots, JOHN DOE and the other police officer drew their handguns.

26.     JOHN DOE claims that he then began to search the crowd to determine who had fired a gun.

27.     Despite having been provided with a body camera, in violation of CITY policy, JOHN DOE did not activate his body camera.

28.     Upon observing Bradford, a young black male with a handgun moving toward Wilson and a second person who was helping Wilson, JOHN DOE fired four bullets from his CITY issued Glock 19X 9mm Pistol, at Bradford, with the specific intent of killing him.

29.    Prior to JOHN DOE firing his handgun, in violation of standard police procedure and training, JOHN DOE did not issue any verbal warnings or commands to BRADFORD.

30.    Prior to JOHN DOE firing his handgun, in violation of standard police procedure and training, JOHN DOE did not _verify_ that Bradford actually presented as a physical threat to anyone.

31.    In violation of standard police procedure and training, after JOHN DOE fired each bullet, JOHN DOE did not stop and reassess the threat level before firing the next bullet.

32.    Prior to JOHN DOE firing his handgun, the police officer who was with JOHN DOE observed Bradford holding a handgun but did not fire _any_ bullets at Bradford.

33.    A police officer who observed some of the events from the floor below the shootings reported that it would have been impossible for JOHN DOE to have determined the location of the shooter from JOHN DOE'S vantage point.

34.    After shooting Bradford, neither JOHN DOE nor any other CITY police officer or mall security provided Bradford with emergency medical care or comfort.

6

35. Instead, JOHN DOE and other CITY police officers and mall security let JOHN DOE bleed out and die, alone, on the cold mall floor, in full view of the public.

### e.  It is Forensically Proven the JOHN DOE Killed Bradford

36. Three of the bullets fired by JOHN DOE entered Bradford's body.

37. The fourth bullet fired by JOHN DOE struck a pillar to the right of the entrance of the FootAction store.

38. On November 23, 2018, the Jefferson County Coroner Medical Examiner's Office ("JCCMEO") performed an autopsy on Bradford.

39. JCCMEO determined that Bradford had been shot three times: (a) head, back right; (b) neck, middle; and (c) back, just above the right buttock.

40. JCCMEO determined that Bradford died from an injury to the brain caused by a bullet fired by JOHN DOE that struck Bradford on the back right side of his head.

### f.  JOHN DOE Violated State and National Training Standards

41. Police Officers around the nation receive active shooter training via a program known as the Advanced Law Enforcement Rapid Response Training ("ALERRT").

42.    ALERRT reportedly defines an "active shooter" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area" like a school or shopping mall.

43.    JOHN DOE never observed any fact indicating that Bradford was "actively engaged in killing or attempting to kill people."

44.    As such, it was not objectively reasonable for JOHN DOE to conclude that Bradford was an "active shooter."

45.    It has been reported that as part of the ALERRT training, police officers are taught a "Priority of Life Scale" that is supposed to govern their decision making at an active shooting scene:

    1. Innocent civilians;
    2. First Responders;
    3. Actors / suspects; and,
    4. Property.

46.    Using this Priority of Life Scale, police officers are reportedly trained that above all else, "innocent life must be defended."

47.    JOHN DOE, however, acted contrary to this training directive when he failed to protect Bradford who was both an innocent civilian and a first responder.

48.    Police officers nationally are taught to _verify_ threats before acting against them.

8

49.     JOHN DOE unlawfully killed Bradford, however, because he *assumed* the existence of a threat instead of *verifying* the existence of a threat.

50.     A majority of police officers in other police departments in the State of Alabama are taught that with an Alabama Pistol Permit, citizens may lawfully possess concealed handguns in the State of Alabama.

51.     A majority of police officers in other police departments in the State of Alabama are taught that citizens are lawfully permitted to use deadly force to protect themselves and others from serious injury or death.

52.     Nationally, police officers are taught that off duty police officers often carry concealed handguns and are expected to take appropriate law enforcement action to stop crime and/or to protect life when necessary.

53.     Nationally, police officers are taught that undercover police officers often wear civilian clothing and possess concealed weapons.

54.     Nationally, police officers are taught that law enforcement officers from state and federal agencies often wear civilian clothing and possess concealed firearms.

55.     Nationally, police officers are taught that first responders and Good Samaritans usually move *toward* victims to assist them.

56.     Therefore, even if it is true that JOHN DOE observed Bradford in civilian clothing moving toward Wilson while holding a handgun, these facts are not verification of a credible threat; let alone a deadly threat.

57.     Therefore, any *subjective* fear that JOHN DOE claims to have had was not *objectively* reasonable, and not a valid defense for his unlawful conduct.

g. **JOHN DOE Failed to Attempt to Deescalate the Situation Before Resorting to Deadly Force**

58.     Nationally, police officers are taught to give clear verbal warnings and/or commands to suspects to deescalate and control potentially dangerous situations.

59.     While the two shootings appear to have taken place within a period of seconds, it takes only a fraction of a second for a police officer to yell "Police," "Stop," "Don't Move," "Get Down on the Ground," or "Put the Gun Down."

60.     JOHN DOE, however, admits that he never gave Bradford *any* verbal warnings or commands from which he could further assess *and verify* Bradford's status as either (a) an innocent civilian and/or first responder, or (b) a credible threat.

61.     JOHN DOE'S failure to attempt to deescalate and control the scene by providing verbal warnings or commands to Bradford, before firing bullets at him, deprived Bradford of any opportunity to save his own life.

62.     JOHN DOE'S primary duty was to eliminate any threat to innocent civilians and first responders, not to kill them.

63.     Instead, JOHN DOE essentially just flipped a coin and recklessly shot bullets at Bradford while hoping that his coin toss had selected the correct answer.

64.     In addition to unlawfully killing Bradford, JOHN DOE placed a crowd of other innocent civilians, which included young children, at great risk of serious emotional and physical injury and/or death.

## h. CITY Protects JOHN DOE'S Reputation While Publishing False Statements About Bradford.

65.     While the CITY and JOHN DOE continue to refuse to identify JOHN DOE, the CITY was quick to publicly identify Bradford and to issue false statements about him.

66.     The CITY initially falsely stated that Bradford shot a 12 year old and an 18 year old, and that police shot and killed Bradford as Bradford tried to escape.

67.     The CITY then falsely stated that witnesses and forensic evidence indicated that Bradford may have been in an altercation at the Galleria.

68.     Finally, the CITY claimed that Bradford "brandished" a gun, but then later stated that the word "brandished" was used only because Bradford had a gun in his hand at a shooting scene.

### i. The CITY'S Deficient Polices and Training Were the Moving Force that Caused Bradford's Untimely Death.

69.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    The CITY, through its final policymakers, NICHOLAS C. DERZIS, Chief of Police, and FRANK V. BROCATO, Mayor, knew that its use of force policy was not regularly updated, did not comport with the standard in the industry, and failed to provide clear guidance to police officers regarding the lawful use of force.

b.    The CITY, through its final policymakers, DERZIS and BROCATO, knew that its use of force training was not regularly updated, did not comport with the standard in the industry, and failed to provide clear guidance to police officers regarding the lawful use of force.

c.    The CITY, through its final policymakers, DERZIS and BROCATO, knew that its use of force policy and training did not acknowledge and respect the Second Amendment rights of *all* citizens of the CITY to lawfully possess handguns.

d.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that its police officers were routinely required to make quick use of force decisions.

e.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that its police officers routinely made incorrect use of force decisions that resulted in violations of citizens' civil rights.

f.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that its police officers were routinely required to evaluate facts to determine whether or not people were credible threats.

g.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that its police officers routinely incorrectly identified persons as threats, which resulted in violations of citizens' civil rights.

h.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that it failed to adopt and implement a de-escalation policy that comports with the standard in the industry.

i.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that it failed to adopt and implement a de-escalation training program that comports with the standard in the industry.

j.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that its police officers were routinely required to deescalate potentially volatile situations but did not know how to correctly do so.

k.      The CITY, through its final policymakers, DERZIS and BROCATO, knew that because its police officers were routinely failing to deescalate potentially volatile situations, citizens' civil rights were violated.

l.      Despite it being plainly obvious to the CITY, through its final policymakers, DERZIS and BROCATO, as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies would protect the rights of citizens, the CITY decided not to provide the training to its police officers.

m.      Despite it being plainly obvious to the CITY, through its final policymakers, DERZIS and BROCATO, as a result of direct observation, citizen complaints, and/or litigation, that additional or different training would protect the rights of citizens, the City decided not to provide the training to its police officers.

n.      The policies (or lack thereof) of both the CITY and the Galleria permitted the unlawful conduct discussed herein.

o.      The training (or lack thereof) of both the CITY and the Galleria permitted the unlawful conduct discussed herein.

### III.  **LEGAL CLAIMS**

### **COUNT I**

**Plaintiff v. Defendant John Doe**
**Fourth Amendment – Unlawful Seizure**
**(pursuant to 42 U.S.C. § 1983)**

70.     Paragraphs 1 through 69 are stated herein by reference.

71.     To comply with the Fourth Amendment, arrests must be supported by probable cause.

72.     In Beck v. State of Ohio, the United States Supreme Court articulated the "probable cause" standard as follows: "Whether that arrest was constitutionally valid depends, in turn, upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether, at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. 89, 91 (1964).

73.     The probable cause inquiry is fact based. See, e.g., Illinois v. Gates, 462 US 213, 239 (1983).

74.     JOHN DOE shooting and killing Bradford constitutes a Fourth Amendment seizure.

75.     When JOHN DOE seized Bradford, probable cause did not exist that Bradford had committed any crime.

76.     Therefore, JOHN DOE seized Bradford in violation of the Fourth Amendment.

77.     As a direct and proximate cause of JOHN DOE'S conduct, Bradford suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

78.     Plaintiff Estate seeks declaratory, compensatory, and punitive damages, attorneys' fees, litigation costs, interest, and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 1983.

## COUNT II

**Plaintiff v. Defendant John Doe**
**Fourth Amendment – Excessive Force**
**(pursuant to 42 U.S.C. § 1983)**

79.     Paragraphs 1 through 69 are stated herein by reference.

80.     Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

81.     To determine "objective reasonableness," while not dispositive, Courts may consider state and federal law, and whether the officer acted in accordance with policies and training.

82.     Neither the Fourth Amendment nor Alabama state law permits police

officers to use excessive force while performing discretionary activities.

83.    The Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause. See Borders v. City of Huntsville, 875 So.2d 1168, 1180 (Ala. 2003); 1975 Ala. Code § 6-5-338.

84.    Moreover, pursuant to 1975 Ala. Code § 13A-3-27, officers are liable if they use more than a reasonable amount of force in making an arrest, and citizens are liable if they use more than a reasonable amount of force in protecting another person.

85.    At the time when JOHN DOE fired bullets into Bradford, Bradford had not committed any crimes.

86.    At the time when JOHN DOE fired bullets into Bradford, Bradford had not threatened to harm anyone.

87.    At the time when JOHN DOE fired bullets into Bradford, an objectively reasonable police officer would not have concluded that Bradford presented as a physical threat to anyone; let alone a deadly threat.

88.    Therefore the firing of bullets into Bradford's body and killing him is excessive and unlawful force.

89.    As a direct and proximate cause of JOHN DOE'S conduct, Bradford

suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

90.     Plaintiff Estate seeks declaratory, compensatory, and punitive damages, attorneys' fees, litigation costs, interest, and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 1983.

## COUNT III

**Plaintiff v. Defendant City**
**Fourth/Fourteenth Amendments – Municipal Liability**
**(pursuant to 42 U.S.C. § 1983) (Monell Claim)**

91.     Paragraphs 1 through 69 are incorporated herein by reference.

92.     "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

93.     In addition, a failure to train may give rise to municipal liability, if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989).

94.     Defendant CITY, through its final policymakers, DERZIS and BROCATO, participated in, authorized, and/or acquiesced in the unlawful conduct

18

discussed herein; adopted, implemented, and/or enforced, policies, practices, and training that did not comport with national standards or state and federal law; and/or failed to adopt, implement, and/or enforce, policies, practices and training that comported with national standards, or state and federal law.

95.    The Defendant CITY, through its final policymakers, DERZIS and BROCATO, maintained deficient policies, practices, and training, which were the moving force that resulted in Bradford's constitutional rights being violated.

96.    As a direct and proximate cause of the CITY'S conduct, Bradford suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

97.    Plaintiff's  Estate seeks declaratory, compensatory, and punitive damages, attorneys' fees, litigation costs, interest, and any other relief available pursuant to Alabama State law and/or 42 U.S.C. § 1983.

## COUNT IV

**Plaintiff v. Defendants**
**Wrongful Death**
**(Pursuant to Alabama Code §6-5-410)**

98.    Paragraphs 1 through 69 are stated herein by reference.

99.    There were no actions brought by the decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

19

100.   Bradford died intestate.

101.   JOHN DOE unlawfully killed Bradford.

102.   The deficient policies, practices, and training of the CITY, through its final policymakers, DERZIS and BROCATO, were the moving force that caused JOHN DOE to unlawfully kill Bradford.

103.   Plaintiff asserts this claim on behalf of herself and all beneficiaries.

104.   As a direct and proximate cause of the Defendants' wrongful acts, Bradford suffered an untimely death.

105.   Therefore, Plaintiff asserts this claim against the Defendants to recover all damages permitted by Alabama Code §6-5-410.

   **WHEREFORE,** Plaintiff respectfully requests that judgment be entered in her favor as follows:

a.   That this Court declare that the Defendants' actions violated Bradford's constitutional rights;

b.   Compensatory damages including but not limited to loss of life, companionship, comfort, financial support, and guidance caused by the death; and the survivor's emotional suffering.

c.   Punitive damages (except against CITY on the Monell claim);

d.   Reasonable attorney's fees and costs; and

e.   Such other financial or equitable relief as is reasonable and just.

## IV.   **JURY TRIAL DEMAND**

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter

that may be tried to a jury.

**RESPECTFULLY SUBMITTED,**

**s/ *Rodney F. Barganier*_____**          **DATE: November 22, 2019**
**RODNEY F. BARGANIER, ESQUIRE**
ASB NUMBER: BAR125
BARGANIER LAW GROUP, LLC
2730 Ensley Avenue
Birmingham, AL 35218
205.776.1776 | rfb@barganierlaw.net
*Co-Counsel for Plaintiff*

**s/ *Frankie E. Lee*_____**          **DATE: November 22, 2019**
**FRANKIE E. LEE, ESQUIRE**
ASB NUMBER: LEE055
BARGANIER LAW GROUP, LLC
2730 Ensley Avenue
Birmingham, AL 35218
205.776.1776 | frankie@barganierlaw.net
*Co-Counsel for Plaintiff*

**DEVON M. JACOB, ESQUIRE**
Bar ID: PA89182
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
*Co-Counsel for Plaintiff (pro hac vice to be filed)*

**BENJAMIN L. CRUMP, ESQUIRE**
Bar ID: 0072583
BEN CRUMP LAW, PLLC
122 S. Calhoun, Street
Tallahassee, FL 32301
844.638.1822 | ben@bencrump.com
*Co-Counsel for Plaintiff (pro hac vice to be filed)*