FILED
2020 May-22  PM 12:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### (Southern Division)

| | |
|---|---|
| **APRIL M. PIPKINS, individually, and as the Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR,** | **No. 2-19-cv-01907-RDP** |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION – LAW** |
| **DAVID ALEXANDER,** | **JURY TRIAL DEMANDED** |
| **CITY OF HOOVER, ALABAMA,** | |
| **RIVERCHASE GALLERIA MALL,** | |
| **JOHN DOE,** | |
| **BROOKFIELD ASSET MANAGEMENT, INC.** | |
| **BROOKFIELD PROPERTY PARTNERS, L.P.,** | |
| **BROOKFIELD PROPERTIES,** | |
| **Defendants.** | |

---

### FIRST AMENDED COMPLAINT

---

AND NOW comes the Plaintiff, APRIL M. PIPKINS, individually, and as the Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR, by and through her undersigned counsel, DEVON M. JACOB, ESQUIRE, of JACOB LITIGATION, INC.; RODNEY F. BARGANIER, ESQUIRE and FRANKIE E. LEE, ESQUIRE of Barganier Law Group, LLC; and BENJAMIN L. CRUMP, ESQUIRE, of BEN CRUMP LAW, PLLC; and avers as follows:

## I.    <u>JURISDICTION AND VENUE</u>

1.    This action is brought pursuant to 42 U.S.C. § 1983.

2.    Jurisdiction is founded upon 28 U.S.C. § § 1331, 1343 & 1367.

3.    Venue is proper in this Court, as all Defendants are located within the Northern District of Alabama, and the cause of action arose in the Northern District of Alabama.

## II.    <u>PARTIES</u>

4.    Plaintiff, APRIL M. PIPKINS ("PIPKINS"), is the biological mother of the decedent, EMANTIC "EJ" FITZGERALD BRADFORD, JR, and is the duly appointed Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR ("ESTATE" or "EJ").

5.    Defendant, DAVID ALEXANDER ("ALEXANDER"), is an adult individual, who during all relevant times, was employed by the City of Hoover, Alabama, as a police officer. All of ALEXANDER'S actions or inactions were taken under color of state law. He is sued in his individual and official capacities.

6.    Defendant, CITY OF HOOVER, ALABAMA ("CITY") was incorporated in 1967 and has a mayor/council form of government. The CITY is located in Jefferson and Shelby Counties in the State of Alabama. The CITY owns

and operates the Hoover Police Department, which during all relevant times, employed ALEXANDER.

7.      Defendant, RIVERCHASE GALLERIA MALL ("GALLERIA"), is located at 2000 Galleria Circle, Birmingham, Alabama 35244.

8.      Defendant, JOHN DOE is believed to be an owner/investor of the GALLERIA.

9.      Defendant, BROOKFIELD ASSET MANAGEMENT, INC. ("BAM"), is a leading global alternative asset manager of real estate, infrastructure, renewable power, private equity and credit. BAM has a corporate office located at Brookfield Place New York, 250 Vesey Street, 15th Floor, New York, NY 10281. BAM is believed to be an owner/investor of the GALLERIA. BAM owns BROOKFIELD PROPERTY PARTNERS, L.P.

10.     Defendant, BROOKFIELD PROPERTY PARTNERS, L.P. ("BPP"), is a diversified global real estate company that owns, operates and develops office, retail, multifamily, industrial, hospitality, triple net lease, self-storage, student housing and manufactured housing assets. BPP has a corporate office located at Brookfield Place New York, 250 Vesey Street, 15th Floor, New York, NY 10281. BPP is believed to be an owner/investor of the GALLERIA.

11.    Defendant, BROOKFIELD PROPERTIES ("BP"), is a fully-integrated, global real estate services company that provides portfolio management and development capabilities across the real estate investment strategies of BAM. BP has a corporate office located at Brookfield Place New York, 250 Vesey Street, 15th Floor, New York, New York 10281. It is believed that BP provides management services to, and operates, the GALLERIA on behalf of JOHN DOE, BMA, and BPP.

## III.  **MATERIAL FACTS**

### a. **Emantic "EJ" Fitzgerald Bradford, Jr.**

12.    EMANTIC FITZGERALD BRADFORD, JR ("EJ") was born on June 18, 1997.

13.    EJ is the biological child of APRIL M. PIPKINS ("PIPKINS") and EMANTIC F. BRADFORD, SR ("BRADFORD").

14.    EJ has two brothers, KHALIL L. PIPKINS and ANDREW W. BRADFORD, and a stepbrother, CLE'MON BRADFORD.

15.    EJ earned his high school diploma and then enlisted in the United States Army.

16.    EJ completed basic training and planned to become a combat engineer.

4

17.    EJ had no criminal history, worked full time, and provided his mother, PIPKINS, with financial assistance.

18.    EJ provided medical care for his father, BRADFORD, a former Birmingham Police Department employee of 25 years, who was suffering from cancer at the time of EJ's untimely death.

### b.  <u>Alabama Gun Laws</u>

19.    The State of Alabama is an "open carry" state; meaning, citizens are lawfully permitted to openly carry a gun in public where it is not hidden from public view.

20.    In the State of Alabama, citizens are lawfully permitted to "conceal carry"; meaning, to carry a gun on one's person concealed from the public's view, as long as the person has obtained an Alabama Pistol Permit.

21.    During all relevant times, EJ possessed a valid Alabama Pistol Permit.

22.    During all relevant times, EJ exercised his Second Amendment right and his Alabama State law right to carry a concealed handgun.

### c.  <u>Erron Brown Shoots Brian Wilson</u>

23.    On November 22, 2018, Erron Brown shot 18-year old Brian Wilson, in the Riverchase Galleria Mall, which is located at 2000 Galleria Circle, Birmingham, Alabama 35244.

24.     The shooting occurred on a second floor walkway of the Galleria, in the vicinity of the JC Penny and FootAction stores.

25.     After shooting Wilson, Brown ran from the crime scene toward the JC Penny store.

### d.  David Alexander Unlawfully Shoots EJ

26.     On the same date and approximate time, EJ was lawfully in the Galleria in the vicinity of the FootAction store.

27.     Upon hearing the gunshots, EJ, like other mall patrons, immediately ran for safety.

28.     After realizing that Wilson had been shot, EJ stopped, turned around, drew his lawfully possessed firearm, and did what first responders and Good Samaritans do – he moved *toward* the location of the shooting to try to protect people and to assist Wilson.

29.     On the same date and approximate time, DAVID ALEXANDER ("ALEXANDER") and another police officer were in the Galleria, in the vicinity of the Spencer's store, which was approximately 75 feet from the location where Brown had been shot.

30.    At the time, ALEXANDER and the second police officer were dually employed by both the CITY, as a police officer, and the GALLERIA, providing mall security.

31.    When the shooting occurred, both police officers were behind but in close proximity to EJ.

32.    Upon hearing the gunshots, ALEXANDER and the other police officer drew their handguns.

33.    ALEXANDER claims that he then began to search the crowd to determine who had fired a gun.

34.    Despite having been provided with a body camera, in violation of CITY policy, ALEXANDER did not activate his body camera.

35.    Upon observing EJ, a young black male with a handgun moving toward Wilson and a second person who was helping Wilson, ALEXANDER fired four bullets from his CITY issued Glock 19X 9mm Pistol at EJ with the specific intent of killing him.

36.    Prior to ALEXANDER firing his handgun, in violation of standard police procedure and training, ALEXANDER did not issue any verbal warnings or commands to EJ.

37.    Prior to ALEXANDER firing his handgun, in violation of standard police procedure and training, ALEXANDER did not *verify* that EJ actually presented as a physical threat to anyone.

38.    In violation of standard police procedure and training, after ALEXANDER fired each bullet, ALEXANDER did not stop and reassess the threat level before firing the next bullet.

39.    Prior to ALEXANDER firing his handgun, the police officer who was with ALEXANDER observed EJ holding a handgun but did not fire *any* bullets at EJ.

40.    A police officer who observed some of the events from the floor below the shootings reported that it would have been impossible for ALEXANDER to have determined the location of the shooter from ALEXANDER's vantage point.

41.    After shooting EJ, neither ALEXANDER nor any other CITY police officer or mall security guard provided EJ with emergency medical care or comfort.

42.    Instead, ALEXANDER, other CITY police officers, and mall security personnel, let EJ bleed out and die, alone, on the cold mall floor, in full view of the public.

### e.  It Has Been Forensically Proven that ALEXANDER Killed EJ

43.    Three of the bullets fired by ALEXANDER entered EJ's body.

8

44.    The fourth bullet fired by ALEXANDER struck a pillar to the right of the entrance of the FootAction store.

45.    On November 23, 2018, the Jefferson County Coroner Medical Examiner's Office ("JCCMEO") performed an autopsy on EJ.

46.    JCCMEO determined that EJ had been shot three times: (a) head, back right; (b) neck, middle; and (c) back, just above the right buttock.

47.    JCCMEO determined that EJ died from an injury to the brain caused by a bullet fired by ALEXANDER that struck EJ on the back right side of his head.

### f.  **ALEXANDER Violated State and National Training Standards**

48.    Police Officers around the nation receive active shooter training via a program known as the Advanced Law Enforcement Rapid Response Training ("ALERRT").

49.    ALERRT reportedly defines an "active shooter" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area" like a school or shopping mall.

50.    ALEXANDER never observed any fact indicating that EJ was "actively engaged in killing or attempting to kill people."

51.    As such, it was not objectively reasonable for ALEXANDER to conclude that EJ was an "active shooter."

9

52.     As part of the ALERRT training, police officers are taught a "Priority of Life Scale" that is supposed to govern their decision making at an active shooting scene:

      1. Innocent civilians;
      2. First Responders;
      3. Actors / suspects; and,
      4. Property.

53.     Using this Priority of Life Scale, police officers are reportedly trained that above all else, "innocent life must be defended."

54.     ALEXANDER, however, acted contrary to this training directive when he failed to protect EJ who was both an innocent civilian and a first responder.

55.     Police officers nationally are taught to *verify* threats before acting against them.

56.     ALEXANDER unlawfully killed EJ, however, because he *assumed* the existence of a threat instead of *verifying* the existence of a threat.

57.     Police officers in the State of Alabama are taught that with an Alabama Pistol Permit, citizens may lawfully possess concealed handguns in the State of Alabama.

58.    Police officers in the State of Alabama are taught that citizens are lawfully permitted to use deadly force to protect themselves and others from serious injury or death.

59.    Police officers are taught that off duty police officers often carry concealed handguns and are expected to take appropriate law enforcement action to stop crime and/or to protect life when necessary.

60.    Police officers are taught that undercover police officers often wear civilian clothing and possess concealed weapons.

61.    Police officers are taught that law enforcement officers from state and federal agencies often wear civilian clothing and possess concealed firearms.

62.    Police officers are taught that first responders and Good Samaritans usually move *toward* victims to assist them.

63.    Therefore, even if it is true that ALEXANDER observed EJ in civilian clothing moving toward Wilson while holding a handgun, these facts are not verification of a credible threat; let alone a deadly threat.

64.    Therefore, any *subjective* fear that ALEXANDER claims to have had was not *objectively* reasonable, and not a valid defense for his unlawful conduct.

### g. **ALEXANDER Failed to Attempt to Deescalate the Situation Before Resorting to Deadly Force**

65.     Police officers are taught to give clear verbal warnings and/or commands to suspects to deescalate and control potentially dangerous situations.

66.     While the two shootings appear to have taken place within a period of seconds, it takes only a fraction of a second for a police officer to yell "Police," "Stop," "Don't Move," "Get Down on the Ground," or "Put the Gun Down."

67.     ALEXANDER, however, admits that he never gave EJ *any* verbal warnings or commands from which he could further assess *and verify* EJ'S status as either (a) an innocent civilian and/or first responder, or (b) a credible threat.

68.     ALEXANDER'S failure to attempt to deescalate and control the scene by providing verbal warnings or commands to EJ, before firing bullets at him, deprived EJ of any opportunity to save his own life.

69.     ALEXANDER's primary legal duty was to objectively evaluate the totality of the circumstances to determine whether or not he enjoyed a privilege to use deadly force.

70.     Instead, ALEXANDER essentially just flipped a coin before recklessly and wantonly shooting bullets at EJ.

71.    In addition to unlawfully killing EJ, ALEXANDER placed a crowd of other law abiding civilians, which included young children, at great risk of serious emotional and physical injury and/or death.

### h.  CITY Protects ALEXANDER'S Reputation While Publishing False Statements About EJ.

72.    While the CITY and ALEXANDER refused to identify ALEXANDER, the CITY was quick to publicly identify EJ and to issue false statements about him.

73.    The CITY initially falsely stated that EJ shot a 12 year old and an 18 year old, and that police shot and killed EJ as EJ tried to escape.

74.    The CITY then falsely stated that witnesses and forensic evidence indicated that EJ may have been in an altercation at the Galleria.

75.    Finally, the CITY falsely claimed that EJ "brandished" a gun, but then stated that the word "brandished" was used only because EJ had a gun in his hand at a shooting scene.

### i.  Ownership and Operation of Riverchase Galleria Mall

76.    The RIVERCHASE GALLERIA MALL ("GALLERIA") is located at 2000 Galleria Circle, Birmingham, Alabama 35244.

77.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

13

a.      JOHN DOE is believed to be part owner of the GALLERIA.

b.      BROOKFIELD ASSET MANAGEMENT, INC. ("BAM") owns BROOKFIELD PROPERTY PARTNERS, L.P. ("BPP").

c.      BMA and/or BPP are believed to be part owners of the GALLERIA.

d.      BPP owns BROOKFIELD PROPERTIES ("BP").

e.      BP provides management services and oversees the operation of the GALLERIA.

f.      GALLERIA, JOHN DOE, BMA, BPP, and/or BP, entered into a security contract with CITY.

g.      GALLERIA, JOHN DOE, BMA, BPP, and/or BP, paid CITY directly and/or indirectly for the use of on duty police officers ("security/police officers"), in full uniform, in the GALLERIA.

h.      GALLERIA, JOHN DOE, BMA, BPP, and/or BP, had at least some control over the training, duties, responsibilities, and/or supervision, of these security/police officers.

i.      GALLERIA, JOHN DOE, BMA, BPP, and/or BP, entered into this contract so that the GALLERIA could have security/police officers operating under color of state law.

j.    GALLERIA, JOHN DOE, BMA, BPP, and/or BP, entered into this contract so that the GALLERIA could have the benefit of armed security/police officers.

k.    Specifically, the GALLERIA, JOHN DOE, BMA, BPP, and/or BP did not want to have to call the police and wait for their private property rights to be independently enforced by the police at the CITY'S sole discretion.

l.    Rather, GALLERIA, JOHN DOE, BMA, BPP, and/or BP wanted to purchase the right to use the color of state law, in part, at its discretion.

m.    The GALLERIA, JOHN DOE, BMA, BPP, and/or BP entered into this contract in the hope that the public would believe that the GALLERIA provided security above the level of private security.

n.    The GALLERIA, JOHN DOE, BMA, BPP, and/or BP entered into this contract in the hope that it would deter crime and increase the number of customers.

o.    The purpose of this contract was to increase GALLERIA, JOHN DOE, BMA, BPP, and/or BP'S profits.

78.    ALEXANDER was one of these security/police officers.

79.    When ALEXANDER shot and killed EJ, he was operating as an employee of the (1) CITY, and (2) GALLERIA, JOHN DOE, BMA, BPP, and/or BP.

80.     The GALLERIA, JOHN DOE, BMA, BPP, and/or BP, acknowledged a need for security in the GALLERIA and thus owed their tenants, guests, and invitees properly trained and supervised security personnel in the GALLERIA.

81.     The GALLERIA, JOHN DOE, BMA, BPP, and/or BP, promised their tenants, guests, and invitees, to provide a level of security that met the industry standard.

82.     The GALLERIA, JOHN DOE, BMA, BPP, and/or BP, breached their promise and duty to EJ and others by:

a.      Failing to provide adequate security for their tenants, guests, and invitees, which included EJ.

b.      Failing to screen tenants, guests, and invitees, for weapons before they enter the GALLERIA, so that security/police officers working in the GALLERIA would know who was lawfully possessing a weapon in the GALLERIA.

c.      Failing to properly train security/police officers.

d.      Failing to properly supervise security/police officers.

e.      Failing to devise and implement a security plan for the GALLERIA.

f.      Failing to provide training to prevent racial profiling.

g.      Failing to implement and/or enforce rules pertaining to the possession of weapons in the GALLERIA.

16

h.      Failing to maintain a security program in the GALLERIA that complied with U.S. Department of Justice recommendations and other industry standards.

i.      Permitting a security/police officer to shoot a first responder and Good Samaritan.

j.      Permitting a security/police officer to kill a first responder and Good Samaritan.

**j.  CITY, GALLERIA, JOHN DOE, BMA, BPP, and/or BP'S Deficient Polices and Training Were the Moving Force that Caused EJ's Untimely Death.**

83.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.      CITY (through its final policymakers, NICHOLAS C. DERZIS, Chief of Police, and FRANK V. BROCATO, Mayor), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their use of force policies were not regularly updated, did not comport with the standard in the industry, and failed to provide clear guidance to security/police officers regarding the lawful use of force.

b.      CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their use of force training was not regularly updated, did not comport with the standard in the industry,

17

and failed to provide clear guidance to security/police officers regarding the lawful use of force.

      c.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their use of force policy and training did not acknowledge and respect the Second Amendment rights of *all* citizens of the CITY to lawfully possess handguns.

      d.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their use of force policy and training did not acknowledge and respect the laws of the State of Alabama, which provided citizens of the CITY with the right to lawfully possess and conceal handguns in public in certain situations.

      e.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their security/police officers were routinely required to make use of force decisions.

      f.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their security/police officers routinely made incorrect use of force decisions that resulted in violations of citizens' civil rights.

g.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their security/police officers were routinely required to evaluate facts to determine whether or not people were credible threats.

h.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their security/police officers routinely incorrectly identified persons as threats, which resulted in violations of citizens' civil rights.

i.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement a security plan for the GALLERIA.

j.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement specific policies to govern the actions of security/police officers who were assigned to provide security in the GALLERIA.

k.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement specific training to govern the actions of security/police officers who were assigned to provide security in the GALLERIA.

l.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement a de-escalation policy that comports with the standard in the industry.

m.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement a de-escalation training program that comports with the standard in the industry.

n.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement a policy to prevent racial profiling.

o.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that they failed to adopt and implement a training program to prevent racial profiling.

p.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that their security/police officers were routinely required to deescalate potentially volatile situations but did not know how to correctly do so.

q.    CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, knew that because their

security/police officers were routinely failing to deescalate potentially volatile situations, citizens' civil rights were violated.

r.      Despite it being plainly obvious to CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies would protect the rights of citizens, they decided not to provide the training to their security/police officers.

s.      Despite it being plainly obvious to CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, as a result of direct observation, citizen complaints, and/or litigation, that additional or different training would protect the rights of citizens, they decided not to provide the training to their security/police officers.

t.      The policies (or lack thereof) of CITY, GALLERIA, JOHN DOE, BMA, BPP, and/or BP, permitted the unlawful conduct discussed herein.

u.      The training (or lack thereof) of CITY, GALLERIA, JOHN DOE, BMA, BPP, and/or BP, permitted the unlawful conduct discussed herein.

## IV.   LEGAL CLAIMS

### COUNT I

**Plaintiff v. Defendant David Alexander**
**Fourth Amendment – Unlawful Seizure**
**(pursuant to 42 U.S.C. § 1983)**

84.   Paragraphs 1 through 83 are stated herein by reference.

85.   To comply with the Fourth Amendment, arrests must be supported by probable cause.

86.   In Beck v. State of Ohio, the United States Supreme Court articulated the "probable cause" standard as follows: "Whether that arrest was constitutionally valid depends, in turn, upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether, at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. 89, 91 (1964).

87.   The probable cause inquiry is fact based. See, e.g., Illinois v. Gates, 462 US 213, 239 (1983).

88.   ALEXANDER's shooting and killing EJ constitutes a Fourth Amendment seizure.

89.     When ALEXANDER seized EJ, he did not do so pursuant to a valid arrest warrant.

90.     When ALEXANDER seized EJ, probable cause did not exist that EJ had committed any crime.

91.     At the time when ALEXANDER seized EJ, an objectively reasonable police officer would not have concluded that the seizure was lawful.

92.     Therefore, ALEXANDER's seizure of EJ was a violation of the Fourth Amendment for which he is not immune.

93.     As a direct and proximate cause of ALEXANDER'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

94.     Plaintiff seeks declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT II

**Plaintiff v. Defendant David Alexander**
**Fourth Amendment – Excessive Force**
**(pursuant to 42 U.S.C. § 1983)**

95.     Paragraphs 1 through 83 are stated herein by reference.

96.     Pursuant to the Fourth Amendment of the U.S. Constitution, police officers enjoy a privilege to use objectively reasonable force to effect a lawful arrest.

23

97.    To determine "objective reasonableness," while not dispositive, Courts may consider state and federal law, and whether the officer acted in accordance with policies and training.

98.    Neither the Fourth Amendment nor Alabama state law permits police officers to use excessive force while performing discretionary activities.

99.    Moreover, officers are liable if they use more than a reasonable amount of force in making an arrest, and citizens are liable if they use more than a reasonable amount of force in protecting another person.

100.    At the time when ALEXANDER fired bullets into EJ, EJ had not committed any crimes.

101.    At the time when ALEXANDER fired bullets into EJ, EJ had not threatened to harm anyone.

102.    At the time when ALEXANDER fired bullets into EJ, an objectively reasonable police officer would not have concluded that EJ presented as a physical threat to anyone; let alone a deadly threat.

103.    Therefore ALEXANDER's firing of bullets into EJ'S body and killing him is a violation of the Fourth Amendment for which he is not immune.

104.    As a direct and proximate cause of ALEXANDER'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

24

105. Plaintiff seeks declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

### COUNT III

**Plaintiff v. Defendant CITY, GALLERIA, JOHN DOE, BMA, BPP, and BP
Fourth/Fourteenth Amendments – Municipal Liability
(pursuant to 42 U.S.C. § 1983) (Monell Claim)**

106. Paragraphs 1 through 83 are incorporated herein by reference.

107. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

108. In addition, a failure to train may give rise to municipal liability, if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989).

109. The GALLERIA, JOHN DOE, BMA, BPP, and/or BP, were acting as state actors, in conjunction with CITY, when they contracted with the CITY for the purpose, and in the manner, described above.

110.   CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, participated in, authorized, and/or acquiesced in the unlawful conduct discussed herein; adopted, implemented, and/or enforced, policies, practices, and training that did not comport with national standards or state and federal law; and/or failed to adopt, implement, and/or enforce, policies, practices and training that comported with national standards, or state and federal law.

111.   CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, maintained deficient policies, practices, and training, which were the moving force that resulted in EJ'S constitutional rights being violated.

112.   As a direct and proximate cause of CITY, GALLERIA, JOHN DOE, BMA, BPP, and/or BP'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

113.   Plaintiff seeks declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT IV

### Plaintiff v. Defendant David Alexander
### Negligence
### (Pursuant to Alabama State Law)

114.    Paragraphs 1 through 83 are stated herein by reference.

115.    ALEXANDER was acting in his dual capacity as a police officer employed by the CITY, and as a private citizen employed by GALLERIA, JOHN DOE, BMA, BPP, and/or BP, as a security guard.

116.    ALEXANDER had a duty not to shoot and kill EJ.

117.    ALEXANDER breached his duty to EJ and negligently and/or wantonly shot and killed him.

118.    To the extent that ALEXANDER was acting as a police officer, ALEXANDER acted willfully, maliciously, in bad faith, beyond his authority, or pursuant to a mistaken interpretation of the law.

119.    As a direct and proximate cause of ALEXANDER's conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

120.    Plaintiff seeks punitive damages and any other relief available pursuant to Alabama State law, including Ala. Code § 6-5-410.

## COUNT V

### Plaintiff v. Defendant David Alexander
### Battery
### (Pursuant to Alabama State Law)

121.    Paragraphs 1 through 83 are stated herein by reference.

122.    ALEXANDER was acting in his dual capacity as a police officer employed by the CITY, and as a private citizen employed by GALLERIA, JOHN DOE, BMA, BPP, and/or BP, as a security guard.

123.    ALEXANDER intentionally fired bullets into EJ without a privilege to do so.

124.    The bullets caused unwanted injury and death.

125.    To the extent that ALEXANDER was acting as a police officer, ALEXANDER acted willfully, maliciously, in bad faith, beyond his authority, or pursuant to a mistaken interpretation of the law.

126.    As a direct and proximate cause of ALEXANDER'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

127.    Plaintiff seeks punitive damages and any other relief available pursuant to Alabama State law, including Ala. Code § 6-5-410.

## COUNT VI

**Plaintiff v. Defendants GALLERIA, JOHN DOE, BMA, BPP, and BP
Negligence for Failure to Provide/Maintain a Safe Premises Liability
(Pursuant to Alabama State Law)**

128.    Paragraphs 1 through 83 are stated herein by reference.

129.    As discussed herein, GALLERIA, JOHN DOE, BMA, BPP, and/or BP, breached their duty to exercise ordinary and diligent care for the safety and protection of their tenants, guests and invitees, which included EJ.

130.    This breach of duty caused ALEXANDER to unlawfully shoot and kill EJ.  Said breaches included, but were not limited to:

a.    Failing to provide adequate security for their tenants, guests, and invitees, which included EJ.

b.    Failing to screen tenants, guests, and invitees, for weapons before they enter the GALLERIA, so that security/police officers working in the GALLERIA would know who was lawfully possessing a weapon in the GALLERIA.

c.    Failing to properly train security/police officers.

d.    Failing to properly supervise security/police officers.

e.    Failing to devise and implement a security plan for the GALLERIA.

f.    Failing to provide training to prevent racial profiling.

g.    Failing to implement and/or enforce rules pertaining to the possession of weapons in the GALLERIA.

h.    Failing to maintain a security program in the GALLERIA that complied with U.S. Department of Justice recommendations and other industry standards.

i.    Permitting a security/police officer to shoot a first responder and Good Samaritan.

j.    Permitting a security/police officer to kill a first responder and Good Samaritan.

131.    As a direct and proximate cause of GALLERIA, JOHN DOE, BMA, BPP, and/or BP'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

132.    Plaintiff seeks punitive damages and any other relief available pursuant to Alabama State law, including Ala. Code § 6-5-410.

## COUNT VII

**Plaintiff v. Defendants**
**Wrongful Death**
**(Pursuant to Alabama State Law)**

133.    Paragraphs 1 through 83 are stated herein by reference.

134.   There were no actions brought by the decedent on this cause of action in his lifetime, and none have been brought after his death apart from the present action.

135.   As the duly appointed Personal Representative of the Estate, Plaintiff asserts this claim on behalf of all potential beneficiaries of the Estate, who are presently believed to be APRIL M. PIPKINS; EMANTIC F. BRADFORD, SR; ANDREW W. BRADFORD; KHALIL L. PIPKINS; and CLE'MON BRADFORD.

136.   ALEXANDER unlawfully shot and killed EJ.

137.   The deficient policies, practices, and training of the CITY (through its final policymakers, DERZIS and BROCATO), GALLERIA, JOHN DOE, BMA, BPP, and/or BP, were the moving force that caused ALEXANDER to unlawfully shoot and kill EJ.

138.   As a direct and proximate cause of the Defendants' wrongful acts, EJ suffered an untimely death.

139.   Plaintiff seeks punitive damages and any other relief available pursuant to Alabama State law, including Ala. Code § 6-5-410.

## COUNT VIII

**Plaintiff v. Defendants GALLERIA, JOHN DOE, BMA, BPP, and BP**
**Vicarious Liability/Respondeat Superior**
**(Pursuant to Alabama State Law)**

140.   Paragraphs 1 through 83 are stated herein by reference.

141.   GALLERIA, JOHN DOE, BMA, BPP, and/or BP, are vicariously liable for the torts and resulting damage caused by ALEXANDER, their agent, representative, or employee.

142.   As a direct and proximate cause of GALLERIA, JOHN DOE, BMA, BPP, and/or BP'S conduct, EJ suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

143.   Plaintiff seeks punitive damages and any other relief available pursuant to Alabama State law, including Ala. Code § 6-5-410.

**WHEREFORE,** Plaintiff respectfully requests that judgment be entered in her favor as follows:

a.      For the federal claims, a declaration that the Defendants' actions violated EJ's federal constitutional rights;

b.      For the federal claims, compensatory damages including but not limited to, the value of the constitutional injury, physical injury, physical pain and suffering,

past and future loss of wages and benefits, loss of life, and hedonic damages; loss of companionship, comfort, financial support, and guidance; and the survivors' emotional suffering.

        c.     For all claims, punitive damages (except against the CITY on the Monell claim);

        d.     Reasonable attorney's fees, litigation costs, and interest; and

        e.     Such other financial or equitable relief as is reasonable and just.

## V.    <u>JURY TRIAL DEMAND</u>

Plaintiff respectfully requests a trial by jury on all claims and issues in this matter that may be tried to a jury.

**RESPECTFULLY SUBMITTED,**

**s/ _Devon M. Jacob_**                    **DATE: May 22, 2020**
**DEVON M. JACOB, ESQUIRE**
Bar ID: 89182 (PA)
JACOB LITIGATION, INC.
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
_Counsel for Plaintiff_

**s/ _Rodney F. Barganier_**                **DATE: May 22, 2020**
**RODNEY F. BARGANIER, ESQUIRE**
ASB NUMBER: BAR125
BARGANIER LAW GROUP, LLC
2730 Ensley Avenue
Birmingham, AL 35218
205.776.1776 | rfb@barganierlaw.net
_Counsel for Plaintiff_

s/ *Frankie E. Lee*                             **DATE: May 22, 2020**
**FRANKIE E. LEE, ESQUIRE**
ASB NUMBER: LEE055
BARGANIER LAW GROUP, LLC
2730 Ensley Avenue
Birmingham, AL 35218
205.776.1776 | frankie@barganierlaw.net
*Counsel for Plaintiff*

s/ *Benjamin L. Crump*                         **DATE: May 22, 2020**
**BENJAMIN L. CRUMP, ESQUIRE**
Bar ID: 0072583 (FL)
BEN CRUMP LAW, PLLC
122 S. Calhoun, Street
Tallahassee, FL 32301
844.638.1822 | ben@bencrump.com
*Counsel for Plaintiff*

34

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**(Southern Division)**

| | |
|---|---|
| **APRIL PIPKINS, individually, and as the Personal Representative of the ESTATE OF EMANTIC FITZGERALD BRADFORD, JR,** | **No. 2:19-cv-01907-RDP** |
| **Plaintiff,** | **CIVIL ACTION – LAW** <br> **JURY TRIAL DEMANDED** |
| **v.** | |
| **DAVID ALEXANDER, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date,

I served a true and correct copy of this document, via ECF, on all counsel of record.

**Respectfully Submitted,**

**s/ *Devon M. Jacob***                     **Date: May 22, 2020**
**DEVON M. JACOB, ESQUIRE**