UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| APRIL PIPKINS, | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } Case No.: 2:19-CV-1907-RDP |
| | } |
| CITY OF HOOVER, ALABAMA, | } |
| | } |
| Defendant. | } |

## MEMORANDUM OPINION

This matter is before the court on Defendant David Alexander's Motion for Summary Judgment. (Doc. # 97). The Motion has been fully briefed (Docs. # 98, 108, 116), and is ripe for decision. This is a tragic case. Nonetheless, for the reasons discussed below, Alexander's Motion is due to be granted.

## I.   BACKGROUND[1]

On November 22, 2018, Defendant David Alexander was employed by the City of Hoover, Alabama ("the City") as a police officer. (Doc. # 99-1 at ¶ 2). He had been employed by the City as a certified police officer since 2017. (*Id.*). On November 22, 2018, Officer Alexander and his partner were assigned to foot patrol inside the Galleria Mall ("the Mall"). (*Id.* at ¶ 3). November 22, 2018 was Thanksgiving evening, and the Mall was crowded with shoppers. (Doc. # 99-2 at 13; Doc. # 99-1 at ¶ 5).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

At approximately 9:51 p.m., Officer Alexander and his partner were in uniform on the second floor of the Mall. (Doc. # 99-2 at 8; Doc. # 99-1 at ¶ 5). Officer Alexander heard two gunshots and a female's scream behind him. (Doc. # 99-1 at ¶ 5). Officer Alexander and his partner turned toward the gunshots and drew their firearms. (Doc. # 99-1 at ¶ 5; Doc. # 99-2 at 16, 18).

Officer Alexander was approximately 75 feet away from the location of the initial gunshots when he heard them. (Doc. # 99-2 at 18). He moved toward the area where he heard the gunshots and looked for immediate threats. (Doc. # 99-1 at ¶ 5). Officer Alexander observed a crowd of shoppers near Foot Action running away from where he heard gunshots (*Id*. at ¶ 9), but also observed two males near some railing not running. (*Id*. at ¶ 7, 8, 10). One of the two males was clutching his stomach and appeared to be injured. (*Id.*).

Officer Alexander also observed a male with a handgun in his right hand moving quickly toward the two males who were not running. (*Id*. at ¶ 8). Officer Alexander feared for the lives of shoppers, his partner's life, and his life. (*Id*. at ¶ 10).

Officer Alexander believed that the man running with the gun, later identified as Emantic ("E.J.") Bradford, was about to shoot the two males near the railing. (*Id*. at ¶ 10). Officer Alexander's partner also believed they were confronted with an "active shooter situation." (Doc. # 99-2 at 18). Officer Alexander fired his duty weapon four times, with three bullets striking Bradford and killing him. (Doc. # 99-1 at ¶ 9; Doc. # 99-2 at 22).

Officer Alexander did not provide Bradford any verbal warning before he fired. (Doc. # 114-3 at 37-38, 42, 48, 61-62). Officer Alexander did not believe it was feasible to give a warning. (Doc. # 114-3 at 38, 129-30). Bradford was about 10 feet away from the two males near the railing when Officer Alexander fired. (Doc. # 99-1 at ¶ 10; Doc. # 99-2 at 17). Although he saw Bradford

running toward the injured man with a gun in his hand, Officer Alexander never saw Bradford in a "ready fire" position before he (Alexander) fired his weapon. (Doc. # 114-3 at 132).

The entire event, from the time Officer Alexander heard the two initial shots until he shot Bradford lasted approximately five seconds. (Doc. # 99-1 at ¶ 11; Doc. # 99-2 at 8, 13, 29).

Immediately after shooting Bradford, Officer Alexander recounted the events as follows: "Me and [Officer 2] were standing over there. We heard two shots. And I turned around; we drew our guns. That guy [Bradford] was running toward them with a gun in his hand. I shot him." (Doc. # 99-2 at 16). Surveillance video from inside the Mall captured many of the events and confirms Officer Alexander's timeline. (Doc. # 99-2 at 8-10, 13-15).

Plaintiff provided the preliminary opinion of Nicholas G. Bloomfield, a New Mexico peace officer with over eighteen years' experience, who provides training and consulting services to security, law enforcement, corrections, and military professions. (Doc. # 114-2). Bloomfield's preliminary opinion included the opinion that "Officer Alexander's failure to provide a verbal warning prior to his application of deadly force against [] Bradford Jr., was unreasonable, tactically unsound, and contrary to generally accepted police practices." (Doc. # 114-2 at 6).

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving

3

party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial by pointing to affidavits, depositions, answers to interrogatories, and/or admissions on file. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'") (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)) (cleaned up).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

Although the court must resolve all reasonable doubts in favor of the non-movant, this does not mean the court cannot rely on objective videotape evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, if a videotape clearly depicts events and leaves no material factual disputes, the court need not rely on one party's version of facts when they are obviously discredited by the evidence. *Id.* at 380-81.

### III.    ANALYSIS

Title 42 U.S.C. § 1983 provides a private cause of action against any person who, "under color of" state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Plaintiff April Pipkins is E.J. Bradford, Jr.'s mother.

She filed this lawsuit alleging that Officer Alexander, and others, violated her son's Fourth Amendment rights against unlawful seizure and excessive force in violation of § 1983 when he was shot and killed at the Mall on November 22, 2018. She has also asserted state law claims of negligence, wantonness, and wrongful death against Officer Alexander.

### A. Qualified Immunity Standard

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In a case with facts similar to those presently before the court, the Eleventh Circuit recently summarized the qualified immunity doctrine as follows:

> The qualified immunity doctrine protects an officer unless at the time of the officer's supposedly wrongful act the law "was already established to such a high degree that every objectively reasonable" officer in his place "would be on notice" that what he was doing was "clearly unlawful given the circumstances." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). The doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (quotation marks omitted). For qualified immunity to apply, an officer "must first establish that he acted within his discretionary authority." *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013). Once the officer does that, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010).
>
> To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so. *See, e.g., Terrell*, 668 F.3d at 1250. Plaintiffs can meet the clearly established requirement in one of three ways: (1) by pointing to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose; (2) by establishing that "a broader, clearly established principle should control the novel facts" of the case; or (3) by convincing us that the case is one of those rare ones that "fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

> Under the first and second of these methods, the plaintiff must rely on decisional law. *See Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (noting that in the first method we "look at precedent that is tied to the facts" while in the second method we look for "broad statements of principle in case law [that] are not tied to particularized facts") (emphasis omitted). Under the second and third methods, we look for "obvious clarity": a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent. *Id*. at 1350-51 (noting that "broad statements of principle in case law ... can clearly establish law applicable in the future to different sets of detailed facts" and that the "words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances"); *see also Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019); *Fish v. Brown*, 838 F.3d 1153, 1163 (11th Cir. 2016). In all three methods, the "'salient question' is whether the state of the law at the time of the incident gave [the officer] 'fair warning' that his conduct was unlawful." *Perez*, 809 F.3d at 1222 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 [] (2002)).
>
> We have recognized that obvious clarity "is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (quotation marks omitted). "Concrete facts are generally necessary to provide an officer with notice of the hazy border between excessive and acceptable force." *Id*. (quotation marks omitted). If "case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Corbitt*, 929 F.3d at 1312 (quotation marks omitted).

*Powell v. Snook*, 25 F.4th 912, 920-21 (11th Cir. 2022), *cert. denied*, 2022 WL 4652025 (U.S. Oct. 3, 2022). In this circuit, "only Supreme Court cases, Eleventh Circuit caselaw, and [state] Supreme Court caselaw can 'clearly establish' law." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

Here, Plaintiff does not dispute that Officer Alexander was acting within his discretionary authority. (*See generally* Doc. # 108). Rather, she argues that qualified immunity is not appropriate because (1) the material facts are disputed and (2) clearly established law at the time of the incident provides that Officer Alexander was required to give a verbal warning before shooting. (Doc. # 108 at 12-14).

7

### B. Whether Officer Alexander Violated A Constitutional Right

The court first analyzes "whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395 (1989). "We view the facts 'from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts,' and we 'balance the risk of bodily harm to the [plaintiff's decedent] against the gravity of the threat the officer sought to eliminate.'" *Powell*, 25 F.4th at 921 (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)). This determination is *not* made "with the 20/20 vision of hindsight." *Mobley v. Palm Beach Cnty. Sherriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).

The court notes that "[t]he 'law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Powell*, 25 F.4th at 922 (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)). Instead, an officer may use deadly force when he:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary []; and (3) has given some warning about the possible use of deadly force, *if feasible*.

*Perez v. Suszczynski*, 809 F.3d 1213, 1218-19 (11th Cir. 2016) (quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013)) (emphasis added). Obviously, it is desirable that before using force, an officer give a warning. But, it is simply not always feasible for that to occur.

8

As to the first factor, the threat posed by Bradford, it is undisputed that immediately after two shots were fired in a crowded Mall, Officer Alexander saw Bradford running toward two men, one of who appeared to be injured, and Bradford had a gun in his hand. The court acknowledges that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez*, 809 F.3d at 1220. However, when a suspect's gun is "available for ready use," an officer is "not required to wait and hope for the best." *Powell*, 25 F.4th at 922. Here, Bradford's weapon was in his hand, he was running toward the injured man, and he could have used the gun at any point. The court finds that this factor weighs in favor of a finding that Officer Alexander's use of force was reasonable. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (holding that an officer was entitled to qualified immunity regardless of whether the suspect had pointed the gun at the officer because the suspect's gun was available for ready use and the officer was not required to wait and hope for the best); *see also Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) (determining that an officer was entitled to qualified immunity even where an armed suspect never turned to face the officer because the suspect could have turned "in a split second").

As the Eleventh Circuit has clarified, "the second factor can be reduced to a single question: 'whether, given the circumstances, [plaintiff's decedent] would have appeared to reasonable police officers to have been gravely dangerous.'" *Penley*, 605 F.3d at 851 (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002)). Because shots had just been fired immediately before Officer Alexander saw Bradford running with a gun in his hand toward the injured man, Bradford would have appeared to a reasonable police officer to pose an imminent and dire threat to the injured man and others at the scene. It was reasonable for Officer Alexander to conclude in the heat of the moment, seconds after shots were fired, that Bradford was the shooter and was heading

9

toward the injured man to finish him off. (Doc. # 114-3 at 60-62). Therefore, the court finds that this factor weighs in favor of a finding that Officer Alexander's use of force was reasonable.

As to the third factor, Plaintiff argues that it was unreasonable for Officer Alexander not to have issued a warning to Bradford. "On the subject of warnings, [the Eleventh Circuit] 'ha[s] declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing — particularly where such a warning might easily have cost the officer his life." *Powell*, 25 F.4th at 922 (quoting *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010). The Eleventh Circuit has made clear that it has never held that "an officer must always warn a suspect before firing." *Id*. at 922-23. And, as the Supreme Court has instructed, a plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015).

Five seconds elapsed from when Officer Alexander heard the first shots fired until he saw Bradford running with a gun in his hand toward a man who likely had already been shot. Given this extremely brief period of time, the evidence here is undisputed: it was not feasible for Officer Alexander to issue a warning before shooting Bradford. Bradford was running with a gun in his hand and was only about 10 feet away from the injured man when Officer Alexander fired. In light of these rapidly evolving circumstances, "this factor weighs in favor of immunity." *Cook v. Cobb Cnty., Georgia*, 2022 WL 3758235, at *6 (N.D. Ga. Aug. 29, 2022).

Because the undisputed facts establish all three elements necessary to use deadly force under Eleventh Circuit precedent, the court concludes that Officer Alexander's use of that force was not a constitutional violation.

### C.     Whether Officer Alexander Violated Clearly Established Law

Next, the court examines whether Plaintiff has shown that Officer Alexander violated a statutory or constitutional right that was clearly established when the violation occurred. "A right is 'clearly established' if it would have been apparent to every reasonable officer in [Alexander's] position that his use of force was unlawful." *Perez*, 809 F. 3d at 1221-22.

#### 1.     Count 1 – Fourth Amendment Unlawful Seizure Claim

Regarding the Fourth Amendment unlawful seizure claim in Count 1 of her Second Amended Complaint, Plaintiff argues that Officer Alexander violated Bradford's constitutional rights because he did not have probable cause to arrest Bradford. (Doc. # 108 at 9-10). In support of this argument, Plaintiff points out that, in his deposition, Officer Alexander admitted that he never had more than reasonable suspicion to detain Bradford. (*Id*. at 10).

"To receive qualified immunity, [however,] an officer need not have actual probable cause, but only 'arguable' probable cause." *Grider v. City of Auburn, Ala*., 618 F.3d 1240, 1257 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants *could have* believed that probable cause existed to arrest Plaintiff.'" *Grider*, 618 F.3d at 1257 (emphasis added); *see also Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) (arguable probable cause exists when "the facts and circumstances [are] such that the officer reasonably could have believed that probable cause existed"). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003); *see also Grider*, 618 F.3d at 1257 ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable."). "The standard is an objective one and does not

11

include an inquiry into the officer's subjective intent or beliefs." *Grider*, 618 F.3d at 1257; *see also Swint v. City of Wadley*, 51 F.3d 988, 996 (11th Cir. 1995) ("[W]e determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed.") (quotations omitted). The question of "whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Grider*, 618 F.3d at 1257. However, "showing arguable probable cause does not ... require proving every element of a crime." *Id.*

Moreover, "[t]he Fourth Amendment is not [] a guarantee against all searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (emphasis in original). "The Supreme Court has held that an officer may not only stop, but also conduct a limited detention of someone whom the officer *reasonably suspects* may pose a threat of criminal activity, in order 'to dispel [the officer's] reasonable fear for his own or others' safety....'" *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 853 (11th Cir. 2013) (emphasis added) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The circumstances of this case, taken as a whole, are sufficient to demonstrate that Officer Alexander had reasonable suspicion to detain or "seize" Bradford when he (Bradford) ran toward an injured man with a gun in his hand immediately after two shots had been fired. It was also reasonable for a police officer to conclude that Bradford, who was running toward a gunshot victim with a gun in his hand shortly after shots were fired in a crowded mall, posed a significant threat of criminal activity and a deadly threat to the safety of others at the scene. Qualified immunity is appropriate on this claim because Plaintiff has not demonstrated that it was "clearly established" that Bradford had a constitutional right not to be "seized" under these circumstances.

### 2. Count 2 – Fourth Amendment Excessive Force

Regarding her Excessive Force claim, Plaintiff assets that Officer Alexander violated Bradford's constitutional right to receive a warning before deadly force is used, if it was feasible for a warning to be provided. (Doc. # 108 at 10). In this section of her brief, Plaintiff addresses numerous cases from other jurisdictions for the proposition that an officer's training is relevant to determining whether the use of force was reasonable. (*Id*. at 11). Notably absent from her brief, however, is any attempt to distinguish the recent, factually-similar Eleventh Circuit case of *Powell v. Snook*, which Officer Alexander pointed to in his initial brief. In *Powell*, the Eleventh Circuit noted that it had "'declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing — particularly where such a warning might easily have cost the officer his life.'" *Powell*, 25 F.4th 922 (quoting *Penley*, 605 F.3d at 854 n.6).

In *Powell*, just before midnight on June 7, 2016, a 911 operator received a call from a person who reported a woman's scream and three gunshots. *Id*. at 916. The 911 operator stated the caller indicated that the house where the gunshots and screams occurred was located two or three houses down and on the right from the caller's home. *Id*. at 917. Three uniformed officers parked their cars along the roadway and approached the plaintiff's house, which was later discovered to be the wrong house. *Id*. The house could not be seen from the road, so the officers approached on foot. *Id*. Because this was a domestic violence call with shots fired, the officers approached cautiously "trying to avoid being targets for a shooter." *Id*. There were no lights on in the house. *Id*.

Inside the house, Ms. Powell heard dogs barking and awakened her husband. *Id*. Mr. Powell put on his clothes, grabbed his pistol and walked into an attached garage. *Id*. at 917-18. Mr. Powell pressed the garage door opener which took 8.8 seconds to open the door, and walked 10 to 15 steps

into his driveway with a pistol pointed down at his side. *Id*. at 118. He turned to face the walkway leading up to his house where an officer was positioned in the dark. *Id*. As Mr. Powell began to raise his firearm, the officer dropped to one knee and rapidly fired three shots from his rifle, killing Mr. Powell. *Id*. The incident lasted 17.8 seconds. *Id*. No warning was given by the officer. *Id*.

The personal representative of Mr. Powell's estate sued the police officer and others alleging Fourth Amendment violations for the use of excessive force. *Id*. at 918-19. The district court granted summary judgment to the officer, holding that he was entitled to qualified immunity. *Id*.

On appeal, the crux of the argument was that Mr. Powell received no warning during the 17.8 second period that elapsed between pressing the garage door opener and the officer firing at him. *Id*. at 923. The Eleventh Circuit affirmed the district court's grant of qualified immunity. *Id*. at 924. As the court reasoned, "[w]hether analyzed under the specific facts of prior decisions or under the narrow obvious clarity exception, "[i]nstead of clearly establishing the law against [Snook], binding precedent clearly establishes it in his favor." [*Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018)]." *Id*. The court further explained,

> An officer in Snook's position during the rapidly unfolding events on that dark night reasonably could have believed that the man raising a pistol in his direction was about to shoot him, and our precedent establishes he could "respond with deadly force to protect himself." [*Hunter v. Leeds, City of*, 941 F.3d 1265, 1279 (11th Cir. 2019)]. Snook didn't have to wait until David Powell fired his gun to return fire in self-defense. *See Long*, 508 F.3d at 581. Warnings are not always required before the use of deadly force. *See Penley*, 605 F.3d at 854 n.6; *Carr*, 338 F.3d at 1269 n.19. And as we've explained, giving a warning in the seconds before David raised his gun wasn't a clearly established requirement, *see Shaw*, 884 F.3d at 1100 (noting the "special allowance" for officers in uncertain situations), and giving a warning in the one second between David raising his gun and Snook firing wasn't feasible.

14

*Id*. Here, in the rapidly evolving situation, Officer Alexander perceived an imminent threat to the previously-injured man and was not required to wait until Bradford fired his gun to protect the injured man's life.

In her brief, Plaintiff notes but does not substantively address *Vaughn v. City of Orlando*, 2009 WL 3241801 (M.D. Fla. 2009). In that case, a uniformed officer shot and killed a plain-clothes officer outside a crowded college football game. *Id*. at 1-2. Officer Jenkins was working in plain clothes as an undercover police officer for the University of Central Florida at the Citrus Bowl in Orlando, Florida. *Id*. Officer Jenkins was on patrol alone, which was against the orders of his supervisor. *Id*. Officer Jenkins had made a number of minor in possession of alcohol arrests during his shift outside the stadium. *Id*. As he approached a young woman to ask for identification, a group of rowdy individuals threw beer bottles at him, then fled. *Id*. Officer Jenkins gave chase, caught one of them, and held a gun to his head. A civilian, not knowing Officer Jenkins was a police officer, wrestled him to the ground believing that Officer Jenkins was about to harm that individual. *Id*. Officer Jenkins fired a warning shot, then shot the individual in the abdomen. *Id*. Uniformed officers responded to shots fired. *Id*. at 2. When Officer Smith arrived on the scene, he saw Officer Jenkins, still in plain clothes, pointing a gun at the injured man lying on the ground. *Id*. Officer Smith, fearing for his life and the life of the man on the ground, shot Officer Jenkins in the back twice and in the arm once, killing him. He did so without issuing a warning. *Id*. at 2. The court granted summary judgment to Officer Smith, finding he was entitled to qualified immunity. *Id*. at 2. As the *Vaughn* court reasoned:

> Officer Smith's failure to warn Jenkins before using deadly force was also lawful. Smith did not recognize Jenkins as a police officer. Jenkins was armed and wearing civilian clothing, Jenkins was pointing a gun at Young, Young was injured on the ground, Smith had heard a least one shot from a gun as he approached the scene, and the incident was occurring in a crowded area. [] Confronted with an imminent

15

>situation where Young's life, his own life, and the lives of others appeared to be in danger, Officer Smith lawfully used deadly force without warning.

*Id.* The same can be said about this case: confronted with an imminent situation where the already injured man's life, his own life, and the lives of others appeared to be in danger, Officer Alexander lawfully used deadly force without warning.

Plaintiff has not satisfied her burden of showing that Officer Alexander violated any clearly established law, and therefore Officer Alexander is entitled to qualified immunity. Nor is this a case where the court can contextualize a rule from prior cases that would apply to these facts. As the Supreme Court in *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) stated: "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted)). Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted).

Here, the facts are undisputed and decisional law supports the determination that the use of force without a warning did not violate clearly established law. The preliminary opinion of a former New Mexico peace officer who provides consulting and training services simply does not change this conclusion, nor does it show that Officer Alexander's actions were unreasonable for qualified immunity purposes in this Circuit.

Because Plaintiff has not identified case law with materially similar facts or with a broad statement of principle giving Officer Alexander fair notice that he had to warn Bradford before

using deadly force, she has not met her burden of showing that he is not entitled to qualified immunity. *Powell*, 25 F.4th at 924; *Penley*, 605 F.3d at 849.

The court ends where it began. "'The shooting ... was tragic, as such shootings always are, but tragedy does not equate with unreasonableness' under clearly established law." *Powell*, 25 F.4th at 924 (quoting *Shaw*, 884 F.3d at 1101).

### D.     Plaintiff's State Law Claims and State Agent Immunity

Officer Alexander also argues that he is entitled to state agent immunity under Alabama law on Plaintiff's state law claims against him. (Doc. # 98 at 21-23). Plaintiff responds that state agent immunity should be denied for the same reasons she argues his assertion of qualified immunity should be denied. (Doc. # 108 at 14).

The Alabama Supreme Court described in depth the doctrine of state agent immunity in *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000). "A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's [activities falling within any one of several listed categories]." *Id*. (emphasis in original). Also relevant is peace officer discretionary function immunity, which is provided for in Ala. Code § 6-5-338. That statute states that peace officers "shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code. § 6-5-338(a). The immunity provided to peace officers under § 6-5-338 is broader than the overlapping fourth category set out in *Cranman* – "exercising judgment in the enforcement of the criminal laws of the State." *Hollis v. City of Brighton*, 950 So.2d 300, 309 (Ala. 2006). "Simply stated, [§ 6-5-338(a)] shields every defendant who (1) is a

'peace officer,' (2) is performing 'law enforcement duties,' and (3) is exercising judgment or discretion." *Howard v. City of Atmore*, 887 So.2d 201, 204 (Ala. 2003).

Because statutory immunity under § 6-5-338 is treated as a subcategory of the broader doctrine of state-agent immunity, the Alabama Supreme Court continues to apply the exceptions to state-agent immunity listed in *Cranman* to cases in which statutory peace officer immunity is implicated. *See, e.g., Ex parte Coleman*, 145 So.3d 751, 757-58 (Ala. 2013); *Ex parte City of Montgomery*, 99 So.3d 282, 293-94 (Ala. 2012). Under *Cranman*, State-agent immunity does not apply:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So. 2d at 405.

Alabama courts apply a burden-shifting framework to evaluate the state agent immunity defense. *Ex parte Estate of Reynolds*, 946 So.2d 450, 452 (Ala. 2006). The state agent first bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle him or her to immunity. *Id.* "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id*.

Applying this well-settled law to the undisputed facts of this case, it is clear that Officer Alexander has established that he: "(1) is a 'peace officer,' (2) [was] performing 'law enforcement duties,' and (3) [was] exercising judgment or discretion." *See Howard*, 887 So.2d at 204.

Therefore, the burden shifts to Plaintiff to show that Officer Alexander acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority.[2]

Plaintiff makes no argument that Officer Alexander acted maliciously, fraudulently, or in bad faith. However, she appears to imply that Officer Alexander acted beyond his authority in as much as she argues he should have issued a warning before discharging his weapon. Otherwise, Plaintiff simply argues that that state-agent immunity should be denied for the same reasons she argues qualified immunity is due to be denied. (Doc. # 108 at 14).

But, the court has determined that Officer Alexander is entitled to qualified immunity. And this record is devoid of any evidence that Officer Alexander acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. Therefore, the Officer Alexander is entitled to state-agent immunity under Alabama case law and § 6-5-338 on Plaintiff's state law claims.

## IV. Conclusion

Despite the tragic circumstances of this case (and, to be clear, the circumstances are absolutely tragic), this is not a close call. For all of the forgoing reasons, Officer Alexander's Motion for Summary Judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this December 16, 2022.

*/s/ R. David Proctor*
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[2] The court has already determined that Alexander's actions were appropriate under the Constitution and/or fell within the umbrella of qualified immunity. Thus, Plaintiff cannot argue that Alexander should be stripped of state-agent immunity on the basis that his conduct violated the Constitution.